Argued and submitted June 16, reversed July 23, reconsideration denied September 12, petition for review denied October 7, 1986 (302 Or 86)

# DOWNTOWN COMMUNITY ASSOCIATION et al,
*Respondents,*

*v.*

# CITY OF PORTLAND et al,
*Petitioners.*

(LUBA 85-095; CA A40035)

722 P2d 1258

Stephen T. Janik, Portland, argued the cause for petitioner General American Theaters, Inc. With him on the brief were Susan M. Quick and Ball, Janik & Novack, Portland.

Kathryn Beaumont Imperati, Deputy City Attorney, Portland, attorney for petitioner City of Portland, joined in the brief of petitioner General American Theaters, Inc.

Corinne C. Sherton, Salem, argued the cause for respondents. With her on the brief was Sullivan, Josselson, Roberts, Johnson & Kloos, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

The City of Portland and General American Theaters, Inc. (GAT)[1] petition for review of LUBA's reversal of the city's approval of two applications submitted by GAT in connection with the proposed construction of a 22-story building known as the Broadway Theater Project. The first application was for design approval. The second was for a conditional use permit to allow the construction of an eight-level parking garage in the building. The principal issues in this case center on the city's approval of the second application.

GAT intends to construct the building in two phases. The parking garage is planned as part of the first phase. The city's approval of the conditional use permit for the garage allows GAT to install 392 parking spaces during Phase I. The number of spaces is to be reduced to 312 after Phase II is completed.[2] Respondents argue, and LUBA agreed, that the applicable component of the city's comprehensive plan, section 9 of the Downtown Parking and Circulation Policy (DPCP), allows only 12 spaces to be installed during the first phase and an additional 185 spaces to be installed during the second. Petitioners appear to agree that, if the provision is mandatory, its application would result in those limitations. However, they contend that the provision is only a guideline in the plan and that, as such, it is advisory rather than a mandatory requirement.[3]

■ Section 9 of the DPCP provides, in relevant part:

"A new parking structure which is proposed as part of a new development or redevelopment, may be approved, subject to other applicable sections of this policy * * * provided that the number of parking spaces in the structure does not exceed the number indicated by the following schedules of maximum

---

[1] The city has joined in GAT's brief.

[2] The apparent reason for the reduction is to provide room for elevators.

[3] Respondents also argue, and LUBA also agreed, that the allowance of the conditional use permit violated a second provision of the DPCP. Although neither LUBA nor the parties treat the question in this way, we think that the same considerations which lead us to agree with petitioners' argument concerning the first provision also require a conclusion in their favor in connection with the second. Both provisions are "guidelines" under the relevant plan documents.

parking-space ratios for office and other types of development."

The current version of the DPCP was adopted in October, 1980, through a resolution which recites, as pertinent:

"[T]he City Council intends to provide guidelines and incentives for development of efficient, adequate and convenient parking, which supports the goals and guidelines of the Downtown Plan."

Although the DPCP was apparently not enacted initially as part of Portland's plan documents, it has been incorporated into both the General Plan and the Downtown Plan for the city. Section 8.2 of the General Plan provides:

"8.2   Downtown Air Quality. The revised downtown parking and circulation plan will guide future city efforts on attaining air quality standards in the central business district and allow for expanded employment and housing opportunities downtown."

The Downtown Plan includes the DPCP as its "planning guideline" for parking.

In short, the words "guide" and "guideline" permeate both the legislative history of the DPCP's adoption and the incorporation of the DPCP into the comprehensive plan documents. Extrinsic data also demonstrate that the DPCP provisions were to have the status of guidelines in the plan. Section 33.56.090(1) of the city code, a part of the zoning ordinance which implements the plan, provides that, for parking limitations of the kind in question, "the schedule included in the [DPCP]" is to be used "as a guideline only."[4]

---

[4] LUBA dismissed petitioners' reliance on the zoning ordinance provision as being at odds with the doctrine that the comprehensive plan prevails over zoning and other local land use regulations. *See Baker v. City of Milwaukie,* 271 Or 500, 533 P2d 772 (1975). LUBA noted:

"The zoning ordinance, which by law is inferior to the comprehensive plan, cannot emasculate the plan by simply designating it a 'guideline only.' "

We do not read petitioners' argument based on the ordinance in the way LUBA did. Although it is true that the zoning ordinance cannot be elevated above or be inconsistent with the plan, a zoning ordinance provision *can* serve as an interpretive guide to the meaning of a plan provision, insofar as the provisions are not inconsistent. Here, they are not. The ordinance language is simply more explicit than that of the plan.

Petitioners rely on language in the plan which distinguishes between "goals" and "guidelines" and which classifies the former as mandatory and the latter as advisory. Respondents answer that the language petitioners cite refers to the role of goals and guidelines in the statewide land use planning scheme, *see* ORS 197.015(8),(9), and does not refer specifically to the roles of goals and guidelines in the plan itself. Respondents are correct, but they miss the point as we view it; the word "guideline" is a term of art and, unless the context suggests otherwise, its meaning in local planning documents presumably duplicates its meaning in the statutory scheme. ORS 197.015(9) provides, as relevant:

> "Guidelines shall be advisory and shall not limit state agencies, cities, counties and special districts to a single approach."

LUBA stated, in explanation of its conclusion that the maximum limits of section 9 are mandatory:

> "The words 'guide' and 'guideline' do not necessarily convey the meaning advocated by [petitioners]. The context in which the city's plans use these words to refer to the DPCP, do not demonstrate that the city intended the document to be advisory. The city council may have intended to make the DPCP purely advisory, but it has not clearly expressed that intent in its planning laws.

> "In our view, the critical points are that (1) the DPCP is a component of the city's downtown plan and (2) Section 9 (the parking ratios) is worded as a regulatory measure, in unambiguous, mandatory terms. These points persuade us that [respondents'] challenge must be sustained. * * * As in all cases where there is debate over the meaning of a particular plan provision, much depends on the actual terms used. Here, the plan provision is clearly worded in mandatory language. Section 9 of the DPCP is entitled 'maximum parking space ratios.' The text allows approval of new parking in conjunction with new development,

>> " '. . .provided that the number of parking spaces in the structure does not exceed the number indicated by the following schedules of maximum parking space ratios. . .' "

> "Another provision emphasizes that the ratios are maximums; city administrators may approve plan proposals for fewer parking spaces than are allowable under the ratios, but not for more parking spaces. * * *

"The provision of the DPCP relied on by [respondents] is not purely advisory. It is mandatory." (Footnotes omitted.)

The difficulty we have with LUBA's analysis is that it focuses on what section 9 of the DPCP *says*; the decisive issue is what section 9 *is*. It is immaterial that section 9 or any other provision of the DPCP is couched in mandatory terms if, as we conclude, the plan itself clearly consigns the DPCP in its entirety to a non-mandatory status. We do not understand respondents to argue, or LUBA to have held, that the granting of the conditional use permit violates any provisions of the city's plan or regulations if the DPCP is not mandatory. Because we do not agree with LUBA that the DPCP was made a mandatory part of the plan, we agree with petitioners' assignment that LUBA erred by reversing the city's granting of the conditional use permit.[5]

Petitioners contend next that LUBA's reversal of the city's design approval was erroneous. They point to the fact that LUBA rejected respondents' assignments challenging the design approval, and they argue that LUBA's reversal of the approval was inconsistent with its disposition of those assignments. Respondents argue that the design approval and the conditional use permit were so interrelated that both of the city's decisions had to be reversed if either was. Because we hold that LUBA erred by reversing the granting of the conditional use permit, it follows under either petitioners' or respondents' theory that the reversal of the design approval was also erroneous.

Reversed.

---

[5] Our disposition of petitioners' first assignment makes it unnecessary for us to address their second.