Argued and submitted October 19, reversed and remanded for reconsideration
December 19, 1990, reconsideration allowed by opinion March 6, 1991
See 106 Or App 226 (1991)

Fritz and Joann VON LUBKEN,
Von Lubken Orchards, Inc., and
Hood River Valley Residents Committee, Inc.,
*Petitioners,*

*v.*

HOOD RIVER COUNTY
and Brookside, Inc.,
*Respondents.*

(LUBA 90-031; CA A66473)

803 P2d 750

Steven L. Pfeiffer, Portland, argued the cause for petitioners. With him on the brief were Max M. Miller and Stoel Rives Boley Jones & Grey, Portland.

Sally A. Tebbet, Hood River, argued the cause and filed the brief for respondent Hood River County.

B. Gilliland Sharp, Hood River, argued the cause for respondent Brookside, Inc. With him on the brief was Jaques & Sharp, Hood River.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Petitioners seek review of LUBA's affirmance of Hood River County's approval of respondent Brookside's application for a conditional use permit to develop a golf course on land that is located, in part, in an exclusive farm use (EFU) zone and is "capable of sustaining accepted farming practices." The county zoning ordinance requires that proposed conditional uses comply, *inter alia*, with the comprehensive plan. The issue is whether standard D(9), one of the plan's Goal 3 "land use designations and standards" (standards), precludes the conditional use permit for the golf course. Standard D(9) provides that "[d]evelopment will not occur on lands capable of sustaining accepted farming practices." Petitioners argue that the standard means exactly what it appears to say and that it does not allow a golf course on the land in question. Respondents argue that the standard is not a mandatory approval criterion for conditional use permits and does not affect the approval of the golf course.

LUBA disagreed with respondents' reasoning, but it agreed with their conclusion. LUBA analyzed standard D(9) in the context of the Goal 3 standards as a whole. The relevant standards are duplicated in the margin.[1] LUBA first rejected

---

[1] "1. Accepted farming practices defined by ORS 215.203(2) are permitted to take place in areas designated 'Farm' on the Plan Map and as 'Exclusive Farm Use' on the zoning map.

"2. Non-farm uses permitted by ORS 215.213(2) and (3) shall be minimized to allow for maximum agricultural productivity.

"3. Single family dwellings other than those permitted as accessory uses to farm use are allowed provided they meet the prescribed conditions set forth in ORS 215.213(3).

"4. Farm-related uses designed to sort, box and store (i.e., cold storage) agricultural products are permitted.

"5. Forestry and open spaces are compatible with and are permitted in agricultural lands.

"6. One primary residence will be allowed per lot or parcel. The minimum size for new lots or parcels shall be 20 acres.

"7. The County Zoning Ordinance will be amended to allow golf courses as a conditional use in the Exclusive Farm Use (EFU) Zone.

"8. Accepted farming practices except feed lots are permitted to take place in areas designated as 'Scenic Protection' on the zoning maps. (Applies to the Columbia Gorge area.)

"9. Development will not occur on lands capable of sustaining accepted farming practices.

"10. Redevelopment and improvement of existing communities and other developed area(s) is favored over development which will utilize existing agricultural lands."

county's argument that the standards are not approval criteria. However, it then concluded that standard D(9) does not prevent the approval of the conditional use permit for the golf course. The principal basis for LUBA's holding was its interpretation that standard D(9) does not add conditions or restrictions to those under state law and under standards D(1) through D(8) on uses that the statutes and those standards make conditionally permissible.

LUBA explained:

"Standards D(1) through (8) identify uses that may be allowed in the county's EFU zone. Although Standard D(2) requires that the nonfarm uses permitted by ORS 215.213(2) and (3) be *minimized,* it does not require that such uses be limited to lands not capable of sustaining accepted farming practices. Standard D(9) imposes that requirement on 'development,' but the Plan provides no definition of what is meant by the term 'development.'

"Reading Standard D(9) with Standard D(10) (which refers to 'development,' 'redevelopment,' and 'developed areas'), we believe it is reasonably clear that those policies are not addressed to the limited farm and nonfarm development explicitly permitted within EFU zones consistent with ORS 215.213 and Standards D(1) through (8). Rather, these policies simply restate in somewhat different language the statutory and Statewide Planning Goal requirements that, absent an exception to Statewide Planning Goal 3 (Agricultural Lands) or inclusion of property in an acknowledged urban growth boundary (UGB), agricultural lands are to be placed in EFU zones and may not be planned and zoned for development beyond that permissible in EFU zones.

"In summary, * * * we disagree with the challenged reasoning advanced by the county in support of its conclusion that Standard D(9) does not require golf courses in the EFU zone to be located on lands incapable of sustaining accepted agricultural practices. However, we nevertheless agree with the county's ultimate interpretation of Standard D(9) not to require that conditional uses allowed in the EFU zone be limited to lands incapable of sustaining accepted agricultural practices, although not for the reasons advanced by the county." (Emphasis in original; footnote omitted.)

■ We are unable to agree with LUBA's conclusion that standard D(9) "simply restates" the restrictions on EFU

development that are imposed by state law and that, in relevant respects, are incorporated into county's other standards. ORS 215.213(2), referred to in standard D(2), sets forth a variety of ancillary or nonfarm uses, including golf courses, that may be allowed (at least conditionally) in EFU zones. The statute contains no restriction on the allowance of those uses that corresponds to that of standard D(9). *Compare* ORS 215.213(3). However, counties may enact more restrictive standards for permitting uses enumerated in ORS 215.213(2) than the statute requires. *See Clark v. Jackson County*, 103 Or App 377, 797 P2d 1061, *rev allowed*, 310 Or 791 (1990); *Kola Tepee, Inc. v. Marion County*, 99 Or App 481, 782 P2d 955 (1989), *rev den* 309 Or 441 (1990).

County has done that here. As a general proposition, and as relevant here, ORS 215.213(2) does not limit where or on what type of land in EFU zones the uses that it describes may be located. The same is true of the portions of county's first eight standards, including the standard relating to golf courses, that incorporate ORS 215.213(2) or authorize specific uses that are also allowable under the statute. However, standard D(9) establishes the additional restriction that development may not take place on a certain type of land in EFU zones, *i.e.,* land that is capable of sustaining accepted farming practices. Not all land in EFU zones has that capability. *See* ORS 215.213(3)(b); ORS 215.283(3)(d); *Smith v. Clackamas County*, 103 Or App 370, 797 P2d 1058, *rev allowed* 310 Or 791 (1990) (nonfarm dwellings permitted only on EFU land "generally unsuitable" for farm production.) Consequently, standard D(9) cannot be read as a mere restatement of state law or of standards D(1) through D(8); it adds a significant restriction on development that they do not contain.

Standard D(2), like standard D(9), signifies an intention on county's part to permit nonfarm uses to a lesser extent than the statute would allow. The two provisions are consistent, because the differences in their requirements pertain to different things: Standard D(2) requires minimization of nonfarm uses throughout EFU zones; standard D(9) prohibits any development on a particular type of land in those zones.

We disagree with county's and Brookside's suggestions that, read literally, standard D(9) would lead to absurd results or be inconsistent with the other standards

generally and with standard D(7), relating to golf courses, in particular. Again, standard D(9) simply imposes an additional condition on development that standard D(7) and some of the other standards make conditionally permissible. Standard D(7) does not state, or even suggest, that a golf course may be developed on all or any particular locations in the zone. Standard D(9) describes the type of land in the zone where a golf course may *not* be located, and the two standards can be read with perfect consistency to mean that a golf course may be developed only on land of lesser agricultural quality in the zone.[2]

■    Brookside argues that that interpretation of the standard is contrary to its legislative history and to the history of county planning for the development of a golf course. However, standard D(9) is not ambiguous, and no resort to legislative history is permissible. It is true, as LUBA noted, that the word "development" is not defined in the standard or elsewhere in the relevant plan provisions. However, assuming that the word might be ambiguous in other contexts, there is no reasonable way that it can be read not to encompass a 169-acre golf course. It may also be true that the clear and literal language of standard D(9) is contrary to the enacting body's intent. If so, as LUBA also suggested in its opinion, county may decide to amend or repeal the standard. However, neither county, LUBA nor we may repeal the standard *de facto* through an interpretation that is contrary to its plain language.[3]

We conclude that there is no question about what standard D(9) *means.* Respondents' somewhat stronger argument is that there is some doubt about what standard D(9) *is.* They contend that the standard is not an approval criterion

---

[2] County found that a "high quality golf course" could only be maintained on lands capable of sustaining accepted farming practices. However, standard D(7) refers only to "golf courses," without specifying a quality level, and LUBA concluded that there was not substantial evidence "that it is not possible to establish a 'golf course' on lands not capable of sustaining accepted farming practices." Brookside questions that conclusion in its brief but does not cross-assign it as error or suggest why it might be wrong.

[3] LUBA also noted that, read as petitioners and we read it, standard D(9) would preclude development on all agricultural land with the specified capability, including land outside EFU zones and inside the urban growth boundary. That question is not before us.

for particular conditional use permit applications, but instead serves as a standard for broader legislative or planning actions. It is, of course, correct that not every provision in a comprehensive plan constitutes an approval criterion for specific land use decisions. *See Downtown Comm. Assoc. v. City of Portland,* 80 Or App 336, 722 P2d 1258, *rev den* 302 Or 86 (1986); *Stotter v. City of Eugene,* ___ Or LUBA ___ (LUBA No. 89-037, October 10, 1989). As we explained in *Downtown Comm. Assoc.,* whether a particular plan provision is an approval criterion for conditional use permit applications must be determined from the function that the plan itself assigns to the provision.

■         Here, the plan lends little support to respondents' argument. The definition section of the policy portion of the plan states, in part:

> "When goals, policies, strategies, *land use designations and standards * * ** are used to implement a specific statewide Goal requirement [here Goal 3], mandatory language ('shall' and '*will*') is used. *When mandatory statements are used, they become legally binding on land use decisions.*" (Emphasis supplied.)

That language fits standard D(9) exactly. Although LUBA rejected county's and Brookside's argument that none of the standards is an approval criterion for conditional use permit applications, it observed that they "correctly note that the above quoted plan language does not say plan provisions with mandatory language are binding on *all* land use decisions." (Emphasis in original.) In the absence of qualifying language, the quoted provision cannot be read to mean that what it plainly designates as mandatory approval criteria for land use decisions apply to some land use decisions but not others. Standard D(9) is applicable to this land use decision, and the golf course is not allowable under it.

Reversed and remanded for reconsideration.